UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | |
|---|---|
| DONNA LANGAN, § | |
| TERESA DE BARBARAC, and § | |
| ALEXANDRA CARSON § | |
| Plaintiffs, § | |
| § | Cause No. 1:20-cv-275 |
| v. § | |
| § | |
| GREG ABBOTT, in his Official Capacity as § | |
| Governor of Texas; and § | |
| KEN PAXTON, in his Official Capacity as § | |
| Attorney General of Texas § | |
| Defendants. § | |

**FIRST AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF**

Plaintiffs Donna Langan, Teresa De Barbarac, and Alexandra Carson are transgender persons, currently and formerly incarcerated by the Federal Bureau of Prisons. They respectfully bring this lawsuit to challenge the constitutionality of Texas Family Code 45.103, which prohibits people from legally changing their names to comport with their genders while they are incarcerated or on community supervision, and within two years of release.

For most trans people, legal name change is seen as one of the most important aspects of gender affirmation. Research shows incarcerated trans people who are denied the opportunity to change their names are at substantially heightened risk of depressive symptoms and suicide. Further, for trans people in the free world, research has shown the inability to change gender identity documents to reflect their actual (as opposed to assigned) gender causes an increased risk of verbal and physical assault, as well as denial of services, housing, and employment. Either scenario is cruel and unusual punishment, in violation of the Eighth Amendment.

## JURISDICTION AND VENUE

1. This Court has subject matter jurisdiction over federal civil rights claims, pursuant to 28 U.S.C. §1331.

2. Defendants' government offices are located in Travis County, Texas. Accordingly, the Court is the proper venue, pursuant to 28 U.S.C. §1391.

## PARTIES

3. Donna Langan is incarcerated at FMC Carswell, and is serving a sentence of life without parole. She is a transgender woman who was assigned male at birth ("AMAB")[1]. FBOP implicitly affirms her female gender identity by housing her at a facility designated for women. To the extent, however, that she continues to be legally identified by a masculine name, her identity as a woman is not legally affirmed. Texas Family Code 45.103 prevents her from legally changing her name, causing her acute and ongoing emotional and psychological distress, humiliation, and other risks to her physical and mental health.

4. Teresa De Barbarac is currently incarcerated at FCI Texarkana. She is a transgender woman. Because her name is included as an alias on her commitment papers, she is sometimes called by her appropriate name, but all official papers, mail, and the phone system use her "deadname."[2] Texas Family Code 45.103 prevents her from legally changing her name, causing her acute and ongoing emotional and psychological distress, humiliation, and other risks to her physical and mental health.

---

[1] Assigned gender at birth is different from an individual's gender. It is based on the apparent genital configuration of an infant and is a non-scientific proxy for identifying the sex, as opposed to the gender of an individual. Gender is expressed by an individual only at some time after they become a conscious individual, and may or may not be related to their apparent genital configurations or chromosomal makeup.

[2] A deadname (or dead name) is the former name of someone, usually transgender, who has changed their name, whether or not they have done so legally. To deadname (or dead name) someone, i.e. to refer to them by that name, is regarded as an act of significant disrespect. Deadnaming a trans person functions as public humiliation and signals willful ignorance or hostility.

5.     Alexandra Carson, was released from the federal prison system on August 28, 2018. She still lives in Texas. She will be on parole until 2023 and will not be able to change her name until, at a minimum, two years after her parole ends. In the meantime, her appearance and gender will be at odds with the name and gender marker on her official ID and all her official documents, exposing her to suspicion, scrutiny, contempt, and danger in her community. Texas Family Code 45.103 prevents her from legally changing her name, causing her acute and ongoing emotional and psychological distress, humiliation, and other risks to her physical and mental health.

6.     Greg Abbott is the Governor of Texas. In his official capacity he has both the authority and duty to uphold the laws of Texas, and is bound by oath and legal duty to uphold the United States Constitution. U.S. Const. Art. VI. He is sued in his official capacity and may be served at 1010 Colorado St, Austin, TX 78701.

7.     Ken Paxton is the Attorney General of Texas. in his official capacity he has both the authority and duty to uphold the laws of the state of Texas, and is bound by oath to uphold the United States Constitution. U.S. Const. Art. VI. He is sued in his official capacity and may be served at 509 West 11th Street, Room 300, Austin, Texas, 78701.

## STATEMENT OF FACTS

A. <u>Gender affirmation via name change is immensely important to many trans people.</u>

8.     Transgender people often wish to legally change their names to comport with their gender presentation and avoid the multitude of harms that inure to people whose gender does not match their name and identification.

9.     For a trans person, gender-affirming names and pronouns are not mere indulgences but constitute crucial aspects to gender transition. Research shows that being misgendered and denied the ability to present in a gender-affirming way can exacerbate symptoms of dysphoria and depression.

10. For example, a recent study showed that name change significantly decreased mental health issues common among transgender patients, and showed that use of chosen name was a robust predictor of lower depressive symptoms and suicidal behavior.

11. In a 2016 report studying trans people of all genders, ages, and ethnic backgrounds, the ability to secure a legal name change was seen as one of the most important aspects of gender affirmation. Specifically, name change was crucial not only for internal comfort in resolving the dissonance between assigned gender and actual gender, but for avoiding verbal and sexual harassment from others.

> B. <u>Texas denies name changes to many people convicted of a felony until two years have passed since their release from incarceration or completion of community supervision.</u>

12. Under Texas law, a person convicted of a felony is not permitted to change their name until two years have passed since their release from incarceration, or from their completion of community supervision or probation. Texas Family Code 45.103 states:

> (a) The court shall order a change of name under this subchapter for a person other than a person with a final felony conviction or a person subject to the registration requirements of Chapter 62, Code of Criminal Procedure, if the change is in the interest or to the benefit of the petitioner and in the interest of the public.
>
> (b) A court may order a change of name under this subchapter for a person with a final felony conviction if, in addition to the requirements of Subsection (a), the person has:
>
>> (1) received a certificate of discharge by the Texas Department of Criminal Justice or completed a period of community supervision or juvenile probation ordered by a court and not less than two years have passed from the date of the receipt of discharge or completion of community supervision or juvenile probation; or
>>
>> (2) been pardoned.
>
> (c) A court may order a change of name under this subchapter for a person subject to the registration requirements of Chapter 62, Code of Criminal Procedure, if, in addition to the requirements of Subsection (a), the person provides the court with proof that the person has notified the appropriate local law enforcement authority of the proposed name change. In this subsection, "local law enforcement authority" has the meaning assigned by Article 62.001, Code of Criminal Procedure.

C. <u>Denying gender affirmation by name change creates a substantial risk of serious harm to trans people who are incarcerated.</u>

13.     A recent study showed that name change significantly decreased mental health issues common among transgender patients, and showed that use of chosen name was a robust predictor of lower depressive symptoms and suicidal behavior. Significantly, the same study showed that when chosen name was not used in institutional setting, there was a statistically significant *increase* in such symptoms, including a 29% increase in suicidal thoughts and a whopping 56% increase in suicidal behaviors. This is particularly important in the transgender population where suicide attempts are already nine times (or 40%) that of the general population.

14.     Much like excessive periods of solitary confinement may generate serious mental health crises even among people with no history of mental health needs, constant misgendering and misnaming will create or exacerbate depression and dysphoria, creating or increasing the likelihood of self-harm or suicide. This is not because being transgender is a mental health condition, but because being misnamed and misgendered is a kind of intense gas-lighting that amounts to psychological torture.

15.     Respect for the chosen names of trans people is universally understood within clinical fields as indicated in the general, non-incarcerated population, and the bases on which such affirmation is indicated are even more pressing and legitimate in the context of institutions such as prisons.

16.     Institutional refusal to recognize a person's gender also signals to others in a social group that disrespect, and even violence against that person on the basis of their gender will be tolerated, or is even expected. A 2013 study confirmed that a lack of structural support for gender affirmation functioned to expose trans people to increased victimization and marginalization on college

campuses, another institutional environment in which people are closely housed and look to a central authority for messages about acceptable social behavior.

17. There is clear evidence that in military, university, and community settings, access to name change positively impacts quality of life, access to structural needs, and alleviation or prevention of psychological suffering. Conversely, there is clear evidence that denial of name change contributes to marginalization, victimization, harassment, psychological instability, and physical and sexual violence.

> D. <u>Denying trans people the ability to change gender identity documents inflicts punishment beyond their underlying conviction.</u>

18. Several studies have shown that name change is crucial not only for comfort, but for increasing a trans person's access to housing, employment, and higher income, because "passing" as the gender with which you are identified is an unexamined predicate social condition for stability. Conversely, not passing leads to incredible instability, which itself exposes individuals to unnecessary contact with law enforcement and both state and private violence.

19. The United States Trans Survey, which surveyed 27,715 transgender people, demonstrated that among 32% of people who had gender identity documents that did not reflect their actual as opposed to assigned gender, there was an increased incidence of verbal and physical assault, as well as denial of services and benefits.

20. In a 2017 study, a cross-sectional group comparison approach was employed to assess the impact of access to name change or lack thereof on the lives of trans women of color. The economic status of those women who were able to obtain a name change was considerably better than those who had not, as demonstrated by both a higher monthly wage and more stable housing.

21. The conclusion of that study was that legal name change is a critical structural intervention for trans women not only in terms of health and comfort, but to improve their structural access to income and housing.

22. In this 2017 study comparing structural barriers to healthcare and experiences of physical and verbal harassment in trans women with and without name changes, the differences were stark. There was 23.5% less employment among women without name change. The income disparity was also vastly different, with trans women who had been able to change their names to comport with their gender identities making over $1000.00 per month; at least double the rate of those lacking name change.

23. Trans women who had accessed a name change were 37.3% more likely to be housed in a house or apartment and to be safe and stable, whereas nearly 10% of those without a name change were housed in transient motels or boarding houses.

24. The negative healthcare implications were also clear for trans women without name change: they were 15.7% more likely to look for health information online rather than going to a doctor, 18% more likely to postpone necessary medical care, and shockingly 36% more likely to seek transitional treatment from unlicensed providers.

25. Women without name changes also experienced more than 20% more verbal harassment from family and friends, and almost 7% experiencing physical attacks from strangers.

26. Even something as simple as opening a bank account or getting pulled over for a broken tail light can escalate quickly out of control if an individual's visual gender presentation is at variance with their identification documents. The awareness that they will be suspected of fraud creates perverse incentives for trans people to avoid accessing needed documents (for example drivers licenses) and services (for example bank accounts).

> E. <u>Texas law prevents name changes that would otherwise be available to federal inmates.</u>

27.     There are several federal correctional facilities in Texas.

28.     Federal correctional facilities are located throughout the United States, and wherever located, they are operated by the Federal Bureau of Prisons (hereinafter "FBOP").

29.     Name changes, however, are governed by state law. All persons incarcerated within the FBOP are subject to federal laws, the laws of their state of residence, and the FBOP rules and regulations.

30.     FBOP, pursuant to its regulatory authority, has promulgated a robust set of protocols, called "Program Statements," which include Program Statement 5200.04, the Transgender Offender Manual, issued in January, 2017, and modified in May, 2018 by Change Note 1 (hereinafter "the TOM").

31.     The TOM defines terms relevant to the identities, needs, and rights of incarcerated trans people; names the responsibilities of staff to incarcerated trans people; designates various responsibilities to certain departments; creates new decision making bodies tasked with determining how, when, or whether to provide clinical services to trans prisoners; and provides for the housing, medical care, and administrative treatment of trans people in the custody of the FBOP.

32.     The TOM includes specific provisions for administratively changing the names of transgender persons confined in federal facilities who have legally changed their names during incarceration. This administrative change applies within FBOP for all purposes.

33.     Other states permit transgender inmates to change their names; federal inmates who happen to be housed in those states are also able to administratively change their names with FBOP while incarcerated. In contrast, transgender inmates in Texas who cannot secure name changes in state court cannot administratively change their names.

34.	By way of illustration, Marius Mason, a federal prisoner assigned female at birth, was until recently incarcerated at FMC Carswell, in Texas. He wished to change his name, but for several years was unable to do so because of Texas law. In Summer, 2019, Mr. Mason was moved across the country to FCI Danbury, in Connecticut. By August, he had successfully completed the application for change of name, and a Connecticut state judge came to the facility to meet with him and sign the judgment affirming his legal name to be Marius J. Mason. Were Mr. Mason to be moved back to FMC Carswell in TExas, the FBOP system would now administratively reflect that his legal name is Marius J. Mason. There is simply no rational argument that the policy considerations underlying the Texas statute hold up to scrutiny, given these facts.

35.	FBOP name change protocols do not impose any unreasonable burden or a threat to the secure operation of a penal facility. Indeed, the TOM *requires* administrative accommodation of legal name changes.

36.	There are practical consequences when a FBOP inmate changes their name, both for their interaction within the facility and with the outside world. For instance, in the absence of a legal name change, all mail must be sent to them under their deadnames, and all phone calls include a recorded message every five minutes that refers to them by their deadnames. This means that they are either forced to endure the humiliation and erasure of being acknowledged only by a name that does not comport with their identity, or limit the amount of mail they send and receive, and the number and length of phone calls they make. They are thus faced with a choice between exposing themselves to increased distress via being misnamed and misgendered, or voluntarily limiting the crucial lifeline to their family and community.

      F. <u>Denying a name change to a person with a felony conviction serves no legitimate purpose.</u>

37. The judicial process of changing a name itself offers a safeguard against using the process to evade civil or criminal liability, because both the previous legal name and new legal name are linked to each other and to the individual's identifying information, including social security number, criminal record, and fingerprints.

38. Any individual petitioning to change their name is not identified solely or even primarily by their name, but by a constellation of other identifiers, such as their date of birth, social security number, state-issued identification, criminal, credit, and dental records, and various kinds of biometric data, from fingerprints to DNA.

39. Prisons, law enforcement, and even probate courts track aliases, former names, and nicknames. People in prison are identified primarily by an inmate or register number. These numbers do not change, even when the legal name of the individual changes.

      G. <u>The Plaintiffs are harmed by the Family Code Section 45.103, because denial of name change functions to serve an illegitimate and discriminatory purpose.</u>

**Donna Langan**

40. Donna Langan is serving "life without parole." FBOP acknowledges that she is transgender, and provides her with Hormone Replacement Therapy (HRT). She has requested surgical interventions. Although she has transitioned such that her gender presentation is female, she is housed in a facility designated for women, and she is addressed by most people at Carswell as "Ms. Langan," she is still referred to in all documents and for all official purposes by her legal name, which does not comport with her gender.

41. Ms. Langan has been subject to degradation and assault by other prisoners and bullying by staff, and has been subject to further reprisals by both when she has dared to object even in the

most delicate way. Furthermore, because verbal hostility is often a herald of impending physical assault, she feels constantly on edge, and is nearly always fearful for her safety.

42. The actions of authority figures set the tone for what is acceptable behavior by prisoners. In the same way that hostility and mockery pave the way for harassment by her peers, she has reason to believe that a legal name change and institutional affirmation would ease a great deal of her suffering and normalize her gender and existence.

43. In the meantime, she remains very isolated due to the discomfort created by the required use of legal name for any visitation, phone, or mail call. "I thought about getting a pen pal," she said, "but I have to send and receive mail in my legal name." In the past she has had mail returned to senders who do not address her by her legal name.

**Teresa De Barbarac**

44. Teresa De Barbarac is a trans woman incarcerated at FCI Texarkana. She receives HRT, and the FBOP acknowledges that she is transgender.

45. She transitioned prior to her incarceration, and the gender-affirming name she uses is listed on her commitment papers as an alias. The FBOP, pursuant to their policy of using any name listed on the commitment papers, acknowledges her gender-affirming name in some, but not all official documents. Her mail, phone, commissary, and medical care all require her to use her deadname.

46. Although some of the staff and other prisoners call her Teresa, others use her deadname as a mechanism for communicating hostility.

47. She harbors intense fear about not being able to change her name upon her release, because in the past, the mismatch between her identity documents and appearance has caused law enforcement to believe she stole a man's car (the car was titled to her in her deadname).

48. She has also been denied jobs on the basis of her name not conforming to her gender presentation.

49. On at least one occasion she almost died because EMTs were unwilling to touch her, once they realized she was transgender by looking at her identity documents.

50. She reports that she has been told by administrative staff that they do not care what name she has legally, they will use it, and that if she is able to get a legal name change, it will make absolutely no difference to security or safety, for her, for them, or for the facility.

51. For all plaintiffs, the institutional use of their deadnames is a constant source of anguish. It has led to a diminution of self-esteem, loss of dignity, and has given rise to serious depressive symptoms and thoughts of self-harm. If continued, the damage is likely to become irremediable.

**Alexandra Carson**

52. Alexandra Carson was released from federal prison in August 2018. She resides in Texas. She is unable to legally change her name because she has not completed parole (and Texas law will not allow her to do so until another two years have elapsed after she completes parole). This means that although she presents as a woman, her state issued identification shows her deadname and identifies her (incorrectly) as a man.

53. There is no doubt that the discrepancy between her identified (and apparent) gender, and the way in which she is officially identified, causes tremendous material confusion, impacting her ability to work and maintain housing, and exposing her to dangers ranging from increased risk of violence to depression.

54. As the law stands today, until two years after she completes parole, Alexandra will encounter bank tellers, police officers, employers, landlords, and cashiers who are likely to suspect her of fraud, unless is able to access a name change or actually falsifies her documents.

55. By making it impossible for her to pass as her gender to anyone who sees her identification documents, the state also exposes her to very real risks of violence.

H. <u>Attorney General Ken Paxton's prior legal interventions are closely related to the facts at hand.</u>

56. Paxton has previously intervened in local matters, relying on his constitutional charge to "defend and enforce state law" as the state's chief legal officer.

57. On February 18, 2015, the Paxton issued a press release about intervening in a Travis County probate case that had declared as unconstitutional Texas' law against same-sex marriage. (Appendix 1).

58. Paxton issued press releases the following two days announcing he had sought mandamus relief from the Texas Supreme Court against the probate judge, a district court judge, and the Travis County Clerk's Office, as well as an order declaring a same-sex couple's marriage license to be void *ab initio*. Paxton stated:

> The Texas Constitution clearly defines marriage as between one man and one woman, as Texas voters approved by an overwhelming majority. The law of Texas has not changed, and will not change due to the whims of any individual judge or county clerk operating on their own capacity anywhere in Texas. Activist judges don't change Texas law and we will continue to aggressively defend the laws of our state and will ensure that any licenses issued contrary to law are invalid.

(Appendix 2-4).

59. Paxton's "Amended Petition for Writ of Mandamus" (March 6, 2015) with the Texas Supreme Court made several representations about his role that he should be collaterally estopped from rejecting in this case, including:

    a. Characterizing the Office of the Attorney General as an adverse party to the constitutional challenge to same-sex marriage. (Appendix 17-18).

    b. Arguing the attorney general "has a justiciable interest in the case given its well-recognized interest in defending Texas law." (Appendix 19, n. 1).

    c. Arguing "the attorney general's office is charged with defending and enforcing [state law]." (Appendix 23).[3]

---

[3] Paxton's request for mandamus relief also signaled he would continue down the path of intervening in local affairs when it fretted that the situation posed "serious harm that could arise absent prompt relief"

13

60. When the Texas Supreme Court later dismissed the application as moot (because the U.S. Supreme Court had made same-sex marriage legal), Justices Willet and Devine agreed with Paxton's characterization of the attorney general's role, saying:

    a. The attorney general has a constitutional duty to defend challenges to state law. *In re State*, 489 SW 3d 454, 456 (Tex. 2016) (Justice Willett, joined by Justice Devine, concurring in the dismissal of the petition for writ of mandamus).

    b. "Texas law could not be clearer: The State's chief legal officer — sworn to 'preserve, protect, and defend' Texas law — should in fact be permitted to preserve, protect, and defend it." *Id*.

    c. "A law may be unfashionable. It may even be unconstitutional. But it cannot be undefended." *Id*. at 457

61. After the U.S. Supreme Court legalized same-sex marriage, Paxton pivoted to defending private discrimination as a form of religious liberty. (Appendix 84) ("[F]ollowing the U.S. Supreme Court's flawed ruling on states' constitutional right to define marriage… the next fight is religious liberty..."). Paxton also signaled he would not merely be a passive defender of state law, saying:

    > But no court, no law, no rule, and no words will change the simple truth that marriage is the union of one man and one woman. Nothing will change the importance of a mother and a father to the raising of a child. And nothing will change our collective resolve that all Americans should be able to exercise their faith in their daily lives without infringement and harassment.

(Appendix 85). Then, on September 7, 2017, Paxton announced Texas was leading a "20-state coalition" to defend a baker who had refused to bake a cake for a same-sex marriage, in violation of Colorado law, based on a "deeply-held religious belief that marriage is the union of one man and one woman." (Appendix 87-88).

62. As his opportunities to attack same-sex marriage diminished, Paxton shifted gears again to attack the rights of trans persons. On May 3, 2016, Paxton wrote a letter to the CEO of Target

---

because it might "inspire same-sex couples to seek similar relief across the State," arguing relief was necessary "to avoid the legal chaos that would follow…" (Appendix 14,18).

about it's new policy to "welcome transgender team members and guests to use the restroom or fitting room facility that corresponds with their gender identity." He requested, "[a]s chief lawyer and law enforcement officer for the State of Texas… the full text of Target's safety policies regarding the protection of women and children from those who would use the cover of Target's restroom policy for nefarious purposes." (Appendix 89).

63. He went further, on September 9, 2016, issuing a press release which said: "I hope Target finally recognizes the importance of protecting its customers, especially in environments where they can be at their most vulnerable. I am offering them the resources of my office to help assist them in improving their safety procedures." (Appendix 90).

64. On May 11, 2016, Paxton announced he was joining seven other states in an amicus brief challenging (what he characterized as) the U.S. Department of Education's "agenda to redefine what it means to be female and male." (Appendix 91).

> "One's sex is a biological fact, not a state of mind," stated General Paxton. "If this radical new interpretation by the Department of Education is permitted to go unchallenged, schools may no longer be able to maintain separate restrooms, showers, and locker rooms on the basis of students' actual sex."

(Appendix 91-92). Paxton simultaneously announced he had intimidated the Fort Worth ISD board of trustees by sending a letter that challenged the legality of the school district's policy on transgender students and bathrooms. (Appendix 92). Not long after, he announced he was joining a lawsuit with 23 states to challenge Title IX bathroom regulations, reiterating the need to "protect them [students] from persons who may abuse access to intimate facilities and threaten our children." (Appendix 97-98).

65. In 2017, Paxton demonstrated continued transphobia with his support of Senate Bill 6 (the "Bathroom Bill"), saying he applauded legislators for "fighting to protect women and children from those who might use access to such facilities for nefarious purposes" (Appendix 96) and

15

urging them "to listen to parents 'just concerned about the safety of their children.'" (Appendix 99).

66. Paxton has clearly telegraphed his abhorrence for trans people and his willingness to sue and intimidate local government and private parties in order to advance his reactionary agenda.

## CAUSES OF ACTION

A. <u>Putting inmates at substantial risk of serious harm is cruel and unusual.</u>

67. The allegations in the paragraphs above are incorporated herein as if fully set forth.

68. It is unconstitutionally cruel and unusual punishment to expose inmates to a substantial risk of serious harm.

69. Denying an incarcerated trans person the right to live with their chosen name predictably causes harm. As was discussed above, there was a statistically significant increase in such symptoms, including a 29% increase in suicidal thoughts and a whopping 56% increase in suicidal behaviors. This is particularly impactful in the transgender population where suicide attempts are already nine times that of the general population.

70. Much like excessive periods of solitary confinement can predictably generate serious mental health crises even among people with no history of mental health needs, constant misgendering and misnaming will create or exacerbate depression and dysphoria, creating or increasing the likelihood of self-harm or suicide.

71. The incarcerated plaintiffs are experiencing the predictable harms described by the studies referenced in this Complaint.

B. <u>Imposing cruel and unusual punishment, in addition to the punishment from an underlying sentence.</u>

72. The allegations in the paragraphs above are incorporated herein as if fully set forth.

73. The effect of Family Code 45.103 on people in community supervision, or within two years of being released from prison or supervision, is punitive, subjecting trans people to additional

punishment beyond their sentences, which is cruel and unusual punishment in violation of the Eighth Amendment.

74. Denying trans persons the right to live with their chosen name or to change gender identity documents to reflect their actual (as opposed to assigned) gender causes an increased risk physical assault, as well as denial of services, housing, and employment.

75. Such a harm, inflicted following conviction of any felony, is cruel and unusual punishment.

## PRAYER FOR RELIEF

Plaintiffs respectfully request that this Court:

1. Issue a declaratory judgment that Texas Family Code 45.103, as applied to Plaintiffs and people similarly situated, is unconstitutional;

2. Issue a permanent injunction enjoining Defendants from denying Plaintiffs and all others similarly situated the right to legally change their names in the state of Texas;

3. Award costs of suit, including reasonable attorney's fees; and

4. Enter all further relief to which Plaintiffs may be justly entitled.

DATED: June 5, 2020.

Respectfully submitted,

/s/ Brian McGiverin
Brian McGiverin
Texas Bar No. 24067760
brian@austincommunitylawcenter.org

Judith Bohr
Texas Bar No. 24092153
judith.bohr@austincommunitylawcenter.org

AUSTIN COMMUNITY LAW CENTER
1411 West Ave
Austin, TX 78701
Telephone: (512) 596-0226
Fax: (512) 597-0805

Moira Meltzer-Cohen
*Pro Hac Vice Pending*
277 Broadway, Suite 1501
New York, NY 10007
Telephone: (347) 248-6771
Fax: (929) 232.2056
mo_at_law@protonmail.com

ATTORNEYS FOR PLAINTIFFS

CERTIFICATE OF SERVICE

    I certify that a true and correct copy of the foregoing has been served on all counsel of record who have appeared in this matter through the Electronic Case Files System of the Western District of Texas.

/s/ Brian McGiverin
Brian McGiverin